[No. A079430. First Dist., Div. Four. Sept. 15, 1999.]

SOUTHERN PACIFIC TRANSPORTATION COMPANY, Plaintiff and Appellant, v.
SANTA FE PACIFIC PIPELINES, INC., Defendant and Appellant.

**COUNSEL**

Brobeck, Phleger & Harrison, Gary S. Fergus, Thomas M. Peterson, Michael B. Green and V. Elise Bigelow for Plaintiff and Appellant.

Mayer, Brown & Platt, Neil M. Soltman, Michael F. Kerr, Anthony G. Graham and Margaret S. Giles for Defendant and Appellant.

**OPINION**

**REARDON, J.**—This is a valuation case, coming by way of a complaint for order of general reference of dispute. The dispute concerns the amount of rent payable to plaintiff railroad by defendant pipeline company[1] for a series of noncontiguous pipeline easements spanning approximately 1,863 miles and running beneath the railroad's right-of-way.

By stipulation the parties charged the referee with determining "the amount of the rent increase payable, if any, in accordance with the 'fair market value of the easement[s]' as of January 1, 1994."

The parties prepared for the reference proceeding with expert opinions using a valuation method known as the "across-the-fence" (ATF) method. Yet, in a rare usurpation of the parties' role in molding the issues, the trial court orchestrated the displacement of this method with one relying on

---

[1]The parties are plaintiff and appellant Southern Pacific Transportation Company (Southern Pacific or railroad) and defendant and appellant Santa Fe Pacific Pipelines, Inc. (Santa Fe or pipeline company).

"comparable" rents. In the end, it was a shutout victory for the pipeline company. The trial court rejected virtually all the railroad's exhibits. So, too, it refused to engage in any interpretation of the agreements to determine the formula for establishing rent, let alone consider extrinsic evidence pertinent to the question. The judgment—for less than one-third of the rent initially proposed by plaintiffs—must be reversed in favor of the railroad.[2]

## I. FACTUAL BACKGROUND

Southern Pacific operates in the states of California, Arizona, Nevada, New Mexico, Oregon and Texas. The relevant history begins in the mid-1950's. At that time, the railroad and Southern Pacific Pipelines, Inc.—the predecessor of Santa Fe—were sister subsidiaries of Southern Pacific Corporation. The pipeline company had the right to install pipelines along the railroad's right-of-way pursuant to two master agreements. The agreements provided for the creation of pipeline easements on the right-of-way property.

In 1983 the two companies entered into a new master agreement whereby the railroad granted to the pipeline company perpetual nonexclusive easements and the right to construct and operate underground hydrocarbon pipelines on its rights-of-way. The 1983 agreement set forth the amounts to be paid for existing pipeline easements through 1993.

Also in 1983 the parent companies of the Southern Pacific and Santa Fe railroads announced a merger. The combination went forward but Southern Pacific—the railroad—was held in a trust and remained separate from the other newly combined entities. The Interstate Commerce Commission ultimately disapproved of the consolidation of the two railroads and required Southern Pacific to be sold to a third party.[3] Meanwhile, the pipeline company became Santa Fe. The railroad and pipeline companies were no longer sister subsidiaries. Rents for pipelines constructed by Santa Fe were established through separate agreements.

In 1991 the railroad sued Santa Fe and related entities, alleging that the 1983 master agreement should be rescinded because it was not negotiated at

---

[2]Santa Fe has filed a cross-appeal urging reversal in its favor. Its theory is that the railroad failed to meet its burden of justifying *any* increase. Therefore, the judgment increasing rent by 28 percent must be reversed. The cross-appeal has no merit for the very reason that the railroad was impermissibly prohibited from putting on its case-in-chief, and therefore was impermissibly prohibited from sustaining its burden of proof.

[3]In 1988 Southern Pacific was purchased by Rio Grande Industries and operated as a subsidiary of that company until 1996 when Union Pacific Railroad acquired it. For convenience, we maintain the nomenclature of Southern Pacific.

arm's length and set artificially low rent for the pipeline easements. (Southern Pacific Transportation Co. v. Santa Fe Pacific Corp. (Super. Ct. S.F. County, 1991, No. 937641).) The parties settled the lawsuit in April 1994. Pursuant to the settlement agreement, the 1983 master agreement was rescinded; the easement agreements of the 1950's were revitalized; the pipeline company's perpetual easement rights were confirmed and the easement locations were modified, reducing the width of the easement at many segments.

The parties compromised the existing claims. As to future rent, the settlement agreement provided as follows: "Beginning January 1, 1994, and every ten (10) years thereafter, SPT may seek an increase of rent to fair market value. . . . If the parties hereto are unable to agree upon the amount of the rent increase, if any, for any such ten (10) year period on or prior to the commencement date of any ten (10) year period, then upon request of either party the parties shall within 30 days thereafter enter into a stipulation pursuant to Rule 244.1 of the California Rules of Court for an order directing a judicial reference proceeding pursuant to California Code of Civil Procedure § 638 et seq. by a single referee . . . to establish the amount of such rent increase in accordance with the fair market value of the easement."

In July 1994 the parties entered into an amended and restated easement agreement, which reiterated the procedure and mechanism for determining rent increases. Exhibit E to the amended easement agreement listed the rent paid in 1993 for the existing easements, pursuant to the settlement. The parties also entered into a side letter agreement in September 1994, which underscored that exhibit E was a restatement of rental amounts actually due and paid for existing easements and thus did not, in itself, "constitute any agreement or admission by Railroad that such amounts were or are fair market rental values for the Existing Easements."

The railroad commenced the instant action for declaratory relief on August 31, 1994. The parties stipulated to the appointment of the Honorable Christian E. Markey, Jr., retired, to serve as temporary judge.

Preparing for trial, each company hired appraisal experts who issued reports using the ATF methodology. Santa Fe engaged the firm of Coopers & Lybrand L.L.P., which valued the easements at $4,930,200. The Coopers & Lybrand report describes the ATF valuation method this way: "The value of the underground real estate easements leased starts with the value of the real estate using the ATF valuation method. The ATF is a method whereby land utilized as a right-of-way is appraised assuming that its market value per square foot is equal to the value of adjacent or adjoining land. The

right-of-way is divided into parcels based on adjacent land uses, and each parcel was valued separately or in groups depending on the predominant adjacent land use. The ATF method is considered a variation of the Sales Comparison Approach, which is typically employed to estimate the value of land."

Once the ATF value, representing "the sum total of the value estimates for the individual land parcels that comprise separate easements" is derived, the next step involves making possible adjustments to reflect the special value of a pipeline corridor. The third step entails determining the extent or percentage of use of the easements. The last step involves determining an appropriate rate of return.

Southern Pacific engaged expert appraiser John Donahue, who prepared a master report calculating rent payable under the ATF method at $17,982,779.

February 6, 1996, was the date scheduled to hear various motions *in limine*. Southern Pacific's ATF appraisals and reports were not yet before the court. However, the court captured a taste of the methodology from Southern Pacific's motion challenging the qualifications of the pipeline company's expert. The court announced that it was narrowing the valuation focus to analysis of "comparable leases or rental agreements for a perpetual corridor longitudinal easement already in place and operational." The court was convinced that "the clearest and best and most appropriate way of determining whether or not the rent being paid is fair market value, . . . is look at the comparables."

Southern Pacific took the position that comparable lease data falling within the court's standard of comparability was not available; that none of the discovery or expert analysis on either side had embraced the comparables approach; and that comparability was not the appropriate analysis. Nevertheless the court demanded that proof proceed using the comparable approach, challenging the railroad to "take another look" at comparable leases "or you may not get started as a plaintiff in this case." At the same time the court indicated it was "not happy about what [the experts] have done. There are six truckloads of what they have done, and I am really not [at] all that interested . . . . [¶] What helps me is seeing what some parties have done in negotiations of comparable leases or rental agreements—not properties, not hypothetical corporations, not residual values, not returns, not fairness of return to either the lessor or the lessee, fairness of payment by the lessee. Those seem to me to be subject to speculation, expert ratcheting beyond

belief." The court emphasized that the agreements deal "with rent, and it seems to me we have fallen into a trap being [led] by experts that suggests we have to do a jillion other things. We're not talking about the value of land. We are talking about fair market value of rent paid for a longitudinal easement . . . ."

Southern Pacific reserved the right to introduce expert evidence under the ATF methodology. Its trial brief developed the view that ATF was the superior methodology, and the methodology contemplated by the agreements. At the commencement of trial, the court announced it would circumscribe opening statements to the issue of comparable rental agreements. Southern Pacific objected and further emphasized that "the comparable leases [sic] is not the fair way to evaluate this easement in accordance with its fair market value . . . ."

The trial court proceeded to take evidence on the comparability of 56 leases. Southern Pacific submitted 23 leases, with the caveat that they were "insufficient in time, number, location, detail or type to form conclusions as to the appropriate rent in accordance with the fair market value of the easement . . . ." Santa Fe offered its own list of 25 leases, which the railroad attacked, some as being too remote, others as not being comparable because rent was set by statute or regulation, not by free market conditions.

On April 1, 1996, the trial court ruled that a sufficient number of comparable leases had been submitted to proceed by way of the comparison method. During further proceedings, the parties sponsored 15 additional leases, Southern Pacific preserving all objections previously made.

The court then directed the parties' experts to prepare reports analyzing the comparables. Upon reconvening the trial, the court conducted a hearing to decide whether to admit both reports into evidence.

Coopers & Lybrand for Santa Fe submitted a report calculating rent at $4,075,555 based on the 30 most comparable leases. The firm used the following methodology: First, it classified the leases by type of county: urban, suburban, agriculture, and mountain and desert. The subject easements were then divided, on a countywide basis, into the same categories. Next, Coopers & Lybrand arrived at a weighted average rent per linear foot for each category of comparable easement, by dividing the aggregate rent by the aggregate length of the easement in each category. This weighted

average rent by category was then applied to the respective segments of the Southern Pacific easements and summed up to arrive at the total rent.

Donahue, for Southern Pacific, came in at $10.5 million, starting with the leases the court found sufficiently comparable and adjusting, where appropriate for market conditions. Donahue used land values "across the fence" in connection with his analysis of the comparable leases to analyze changes in the market over time as measured by changes in land values.

After taking evidence on both reports the trial court was of a mind to admit both, subject to cross-examination. However the next day the court back-pedaled, stating it was disinclined to accept Donahue's report and expressing disfavor because it relied on ATF land valuations. Nonetheless, the court reserved a ruling.

Later, the court urged that Donahue prepare a rebuttal report using an approach similar to that of Coopers & Lybrand. Still later, the court indicated it would admit Donahue's original rental comparison report, subject to cross-examination.

Donahue ended up preparing a matrix report to rebut Santa Fe's evidence. This report identified rent in the range of $11.3 million to $13,750,000. The court rejected it, ruling it was not rebuttal and was also untimely.

At the conclusion of trial Southern Pacific renewed its motion to admit various exhibits into evidence. Responding, the court excluded Donahue's rental comparison report, further elucidating that none of the railroad's exhibits were in evidence except for a limited purpose or for identification.

The court rendered judgment, determining the "fair market rent" of the pipeline easements to be $5 million per year as of January 1, 1994, inclusive of $315,000 for that portion of the right-of-way known as the " 'Alameda Corridor' " which was sold thereafter. The court explained that the underlying agreements[4] "do not provide [or] even suggest the method for arriving at the fair market rent. The rent for 1993 was set and paid and the parties agreed that said amounts do not '. . . by and in itself (sic) constitute any agreement or admission by Railroad [Plaintiff] that such amounts were or are fair market rental values . . . .' " (Original underscore.) Acknowledging that railroads historically used an ATF appraisal process, the court dubbed

---

[4]It appears that the parties and the court at times referred collectively to the settlement agreement, the amended and restated agreement and the side letter as the operative agreements.

that process "at best, pure sophistry or, at worst, immaterial and irrelevant to this proceeding. [¶] In the final analysis, the traditional . . . 'ATF' process, followed and historically used by railroads, has produced over the decades an inflated set of values, not a true market value."

Southern Pacific moved unsuccessfully for a new trial. These appeals followed.

## II. DISCUSSION

The trial court decreed that the agreements did not "provide [or] even suggest" any method for arriving at "fair market rent." This decision, wrong in itself, spawned the erroneous assumption that the court had a clean slate on which to script the methodology for establishing a rent increase, if any, without regard to interpreting the underlying agreements or looking to extrinsic evidence on the matter of valuation. Having gone down that path, the exclusion of plaintiff's evidence followed as a matter of course. It was the wrong path and the decisions that followed likewise were wrong.

### A. *The Trial Court Committed Reversible Error in Failing to Look Beyond the Face of the Agreements*

#### 1. *Contract Interpretation Principles*

The overriding goal of contract interpretation is to give effect to the mutual intention of the parties at the time of contracting, "so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) Faced with contract language that is reasonably susceptible to more than one meaning, certain general rules of contract interpretation come into play to aid the court in resolving the ambiguity. (See *id.* § 1637.) To begin with, the words of a contract are to be understood in their ordinary and popular sense unless the parties use them in a technical sense or "a special meaning is given to them by usage . . . ." (*Id.* § 1644.) Technical words generally are interpreted "as usually understood by persons in the profession or business to which they relate . . . ." (*Id.* § 1645.)

Further, we can explain a contract by reference to the circumstances under which it was made, as well as the matter to which it relates. (Civ. Code, § 1647.) The circumstances under which a contract was made include "the situation of the subject of the instrument, and of the parties to it . . . ." (Code Civ. Proc., § 1860.)

The terms of a writing can also "be explained or supplemented by course of dealing or usage of trade or by course of performance." (Code Civ. Proc.,

§ 1856, subd. (c).) Indeed, where there is a fixed and established usage and custom of trade, the parties are presumed to contract pursuant thereto. (*Reely v. Chapman* (1960) 177 Cal.App.2d 260, 262 [2 Cal.Rptr. 188]; see Civ. Code, § 1655.) Thus, courts can rely on usage and custom to imply a term where the contract itself is silent in that regard.

 Extrinsic evidence on all these circumstances and matters can be offered where it is obvious that a contract term is ambiguous, but also to expose a latent ambiguity. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373] (*Pacific Gas*).)

2. *Application and Analysis*

 In both the settlement and the easement agreements, the parties resolved that any rent increase would be determined "in accordance with the fair market value of the easement." This same requirement was recited in the stipulation for appointment of the referee. Thus under the language of the agreements and the reference charge, rent was to be set consistent with the fair market value of the real property interest subject to rental—namely, the pipeline easements themselves. Had the parties simply intended to defer to the court in setting rent any way the court saw fit, they would not have included the qualifying phrase "in accordance with the fair market value of the easement."

The question then becomes, does this language suggest a mutual intent about a *specific methodology* for arriving at any rent increase? Southern Pacific proposed that it did and that the contracts could be reasonably construed as calling for the ATF method. It was the trial court's job to then decide whether the contracts were reasonably susceptible to this meaning. The rational approach to this interpretive endeavor required the trial court to at least preliminarily consider *all* credible extrinsic evidence offered to show that the instrument could or could not reasonably support the proposed meaning.[5] (*Pacific Gas, supra,* 69 Cal.2d at pp. 39-40.) If, in light of the extrinsic evidence offered, the court decided the language was "reasonably

[5]Santa Fe is of the mind that the court had no obligation to engage in this interpretive process, arguing that the contractual language "clearly does not require ATF and uses a variety of terms . . . ." First, the premise is wrong. To reiterate, the job of the trial court is

susceptible" to the meaning urged, it should have admitted the evidence to aid in the next step of construing the ambiguous language. (*Curry* v. *Moody* (1995) 40 Cal.App.4th 1547, 1552 [48 Cal.Rptr.2d 627].)

In ·this case Southern Pacific repeatedly tried to convince the court to consider various types of extrinsic evidence on the issue of valuation pursuant to the ATF method. These included evidence of conduct of the parties in performing the contract, custom and usage in the industry, and the circumstances surrounding formation of the agreements. All were valid.

### a. *Conduct*

First,· we look to conduct of the parties. ■ In construing contract terms, the construction given the contract by the acts and conduct of the parties with knowledge of its terms, and before any controversy arises as to its meaning, is relevant on the issue of the parties' intent. (*Southern Cal. Edison Co.* v. *Superior Court* (1995) 37 Cal.App.4th 839, 851 [44 Cal.Rptr.2d 227].) ■ It is undisputed that both parties used the ATF method to formulate their pretrial positions on the rent question.

---

to at least provisionally entertain all credible extrinsic evidence offered to ferret out the meaning of a written instrument, even one that is unambiguous on its face.

In any event, the contractual language Santa Fe points to does not defeat Southern Pacific's interpretation. First, Santa Fe highlights language in the settlement agreement providing that in a reference proceeding to determine compensation of any easement, "either party shall be entitled to attempt to introduce any evidence it deems relevant to its case . . . ." In context, this clause refers first to the general release. and other provisions of the settlement agreement, such that the recited language *clarifies* that these provisions do not define what is relevant or admissible in any *future* litigation. Santa Fe also points to the following sentence in the side letter: "[E]ach is free to support or contest in any Reference Proceeding the appropriateness of the rental amounts set forth on <u>Exhibit E</u> [reflecting the amounts currently being paid]." (Original underscore.) Again, context is crucial. In exhibit E the parties assigned agreed values to portions of the easement in settlement of the past rent dispute. The side letter assured that neither party was compromising its freedom to litigate future rent by agreeing to the past rent reflected in exhibit E, and indeed it is clear about this purpose: "Railroad and Company agree that the execution of this letter and the Amended and Restated Easement Agreement do not by and in themselves constitute any agreement or admission by Railroad that the[]amounts set forth on <u>Exhibit E</u> were or are fair market rental values for the Exiting Easements." (Original underscore.)

Santa Fe picks out another snippet from the settlement agreement referring to Southern Pacific's right to "seek an increase of rent to fair market value." This snippet is part of the larger, key clause that spells out *how* this increase will be calculated, namely by agreement of the parties or in a reference proceeding to establish any increase "in accordance with the fair market value of the easement."

These bits and pieces of phraseology do not undermine the role of the parties' mutual commitment to institute a judicial reference proceeding for this very purpose.

b. *Circumstances*

Second, we consider the circumstances surrounding formation of the agreements. Michael Casey, in the capacity of general manager of the railroad's real estate assets, was directly involved in negotiating the key agreements. At trial Southern Pacific tried to prove that the parties intended the phrase "fair market value of the easement" to relate to the value of the land subject to the easement. In this regard it attempted to elicit testimony from Casey about the negotiations and drafting of the agreements on this issue. The court thwarted these efforts, and consequently Southern Pacific sought leave to file a written offer of proof summarizing Casey's testimony on (1) the parties' intent with respect to the meaning of the term "fair market value of the easement," as well as (2) their past practices. The court permitted the filing, but expressed skepticism: "I will interpret it; Mr. Casey won't, because I don't think the language is frankly all that bad. And I keep repeating myself . . . ."

According to the offer of proof, Casey would testify that: (1) outside this litigation, rent under every one of the railroad's longitudinal rental agreements is based on the underlying value of the land subject to the easement and he is not aware of any other method used for determining rent; (2) in an effort to settle the 1991 lawsuit, Southern Pacific's chief appraiser evaluated the ATF value of the easement. This report was shared with Santa Fe to assist settlement negotiations. Santa Fe's expert reviewed the report, discussing the market value of the easement based on the underlying land value; (3) after these analyses were exchanged, the parties negotiated the amended and restated easement agreement as part of settling the 1991 lawsuit. The language for determining any rent increase "in accordance with the fair market value of the easement" did not appear in earlier drafts or other settlement documents. The language was not inserted until the parties reached agreement about narrowing the widths of the various portions of the easements. The reason for narrowing the widths was to reduce the rent increase because the parties contemplated that rental adjustments would be based on the value of the land occupied by the easement; and (4) the side letter did not add to or modify any terms of the amended and restatement easement agreement.

Casey's testimony was admissible.[6] It did not violate the parol evidence rule. On the contrary, the proffered evidence was relevant to prove an interpretation to which the agreements were reasonably susceptible.

---

[6]Santa Fe challenges the relevance and value of Casey's testimony, contending he would only speak to Southern Pacific's intent, not the parties' mutual intent. Items two and three above clearly speak to a mutual intent. Moreover, Casey's proffered testimony about reduc-

### c. *Trade Usage*

Third, we take into account trade usage and custom or standard of the industry. Southern Pacific also attempted to elicit testimony on the industry practice with respect to establishing rental rates for pipelines grounded in railroad corridors. The witness was the railroad's expert appraiser, Charles Seymour. Again, the court was not interested. Nonetheless, Southern Pacific submitted an offer of proof as to the following: (1) within the appraisal industry, the term "market value" is a term of art meaning the capital value or price which a willing buyer would be willing to pay to a willing seller. "Market value" customarily does not mean "rental value"; (2) through the close of discovery in the instant case, the experts and consultants employed by both parties used the ATF method to value rent; (3) the ATF method is the standard methodology used by the appraisal profession to determine rental value easements within transportation corridors; (4) no appraiser active in the field uses the comparable rent method of determining rent for an easement. Appended to Seymour's offer of proof were a series of documents which he would have relied on for his opinion, including documents from Santa Fe which show its reference to the ATF method to determine rent.

Again, this extrinsic evidence was relevant and admissible to prove usage or custom of the industry—including in some instances the pipeline company's own practice—of using the ATF method to determine rents for railroad corridor easements. ■ Parties are presumed to contract pursuant to a fixed and established usage and custom of the trade or industry. (*Ermolieff* v. *R. K. O. Radio Pictures* (1942) 19 Cal.2d 543, 550 [122 P.2d 3]; *Reely* v. *Chapman, supra,* 177 Cal.App.2d at p. 262.) Contract terms must be interpreted according to any special meaning given to them by usage, and technical terms are interpreted as generally understood in the industry. (Civ. Code, §§ 1644, 1645.) ■ Although bits and pieces of evidence on the ATF method managed to get before the court—and ironically the court itself found that the ATF method was historically used to evaluate railroad rights-of-way—it never even entertained the notion that the parties might have contracted according to that historical custom, or that the operative phrase in fact carried a special understanding reflecting the ATF method, or was reasonably susceptible to such an interpretation. There was no good reason to refuse to consider the more extensive, credible extrinsic evidence that Southern Pacific proffered on the matter. To repeat: "[R]ational interpretation requires at least a preliminary consideration of *all* credible evidence

---

tion of width of the easement was not, as Santa Fe contends, cumulative. The point is that the trial court did not consider or hear evidence linking reduction to negotiations on valuation and the exchange of ATF information.

offered to prove the intention of the parties." (*Pacific Gas, supra,* 69 Cal.2d at pp. 39-40, italics added, fn. omitted.)

### 3. *No Admission*

Santa Fe counters with accusations that Southern Pacific offered evidence involving "non-ATF means." This evidence, it claims, shows a course of performance admission by Southern Pacific that the contracts do not demand resort to the ATF approach. Southern Pacific has made no such concession.

Santa Fe alludes to the reports of (1) Joachim Zier and Dennis Mandell, on the amount of excess return to an average pipeline company constructing a pipeline comparable to the Santa Fe pipeline; (2) Joseph Johns, setting forth a pipeline corridor replication study; and (3) F. G. Bercha, on construction costs of a new pipeline or fiber optic cable. Donahue relied on each of these experts and their reports to establish various aspects of his ATF valuation. There was no inconsistency on Southern Pacific's part in offering these reports.

Santa Fe also quotes portions of Southern Pacific's opposition to motions to exclude testimony of two of these experts, but gives an incomplete context in each instance. For example, countering Santa Fe's argument that a condemnation theory of valuation was required, Southern Pacific stated that the easement agreement did not limit "the manner or method in which evidence of the easement's fair market value can be determined" and later that the face of the agreement did not "illustrate an intent by the parties to limit a definition as to what methodology can be used to determine fair market value, nor does the Evidence Code . . . adopt such a limitation." These are not concessions. Southern Pacific was responding to Santa Fe's assault on its expert and was fully prepared—as Santa Fe well knew—to go forward with the ATF analysis. Moreover, shortly thereafter it filed a trial brief squarely setting forth its interpretation of the contracts as looking to the ATF methodology.

### 4. *Reversible Error*

Santa Fe remarkably asserts that the trial court did consider conflicting extrinsic evidence on the quest to discover the meaning of the contracts, and thus we must accept the court's interpretation so long as it is supported by substantial evidence. Santa Fe relies generally on the court's statement of decision to support this assertion. First, we are stymied as to the notion that the court reviewed *conflicting* extrinsic evidence, since Santa Fe offered none. Second, the statement of decision does not refer to any extrinsic

evidence except to acknowledge the historic use of the ATF method and tout the court's own rejection of historic industry practices. Third, while the court says it *considered* everything submitted (but rejected nearly all of Southern Pacific's materials), it considered them solely for the purpose of unilaterally selecting a method for setting rent, not for purposes of construing the contracts. Southern Pacific asked the court to render a decision on the issue of the meaning of the phrase "rent increase in accordance with the market value of the easement." It refused on the ground that this was not a "principal controverted issue[]."

It is reversible error to refuse to consider extrinsic evidence upon concluding that an agreement is clear on its face. (*Pacific Gas, supra,* 69 Cal.2d at pp. 39-41; *Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1143 [234 Cal.Rptr. 630].) Here the trial court resolved that the contracts were clear in *not* providing or suggesting a method for setting rent, the implication being that they left that task up to the referee. We presume this conclusion is prejudicial. Otherwise, we would have to engage in speculation as to what the court might conclude upon properly heeding the proffered extrinsic evidence, and then again as to how its ultimate interpretation would affect determination of rent. Accordingly, this conclusion demands reversal.

## B. *The Trial Court Deprived Southern Pacific of a Fair Trial*

In addition to refusing to use the basic tools of contract interpretation to construe the contracts—and irrespective of whether such construction would have spelled victory for the ATF method—the trial court deprived Southern Pacific of a fair trial. The trial court in effect shut out all of Southern Pacific's expert reports on valuation.

The contracts in question provided that the "judicial reference proceeding shall be conducted pursuant to the California Code of Civil Procedure and the California Evidence Code . . . ."[7] Under our Evidence Code, the value of property may be shown by the opinion of a qualified witness. (§ 813,

---

[7]Santa Fe relies on this phrase to bolster its position that contrary to requiring the ATF process, the contracts delegate the issue of methodology to the referee, who can pick and choose from among various valuation methods approved by the code. Santa Fe then notes that the comparable rent analysis adopted by the trial court was proper under Evidence Code section 818. Santa Fe overstates the significance of the reference to the Evidence Code. The reference, of course, is to the Evidence Code generally, not to the expert opinion provisions. More to the point, the clause in question, appearing in both the settlement and easement agreements, is a choice of law provision, specifying that California rules will govern the reference proceeding. As Southern Pacific points out, given that the easement stretches over six states, it was fitting to conduct the reference proceeding under the laws of one state.

All further undesignated statutory references are to the Evidence Code.

subd. (a)(1).) Pursuant to section 814, the matter upon which the opinion rests must meet each of the following related tests: First, the matter must be "perceived by or personally known to the witness or made known to the witness at or before the hearing . . . ." (*Ibid.*) Second, it must be "of a type that reasonably may be relied-upon by an expert in forming an opinion as to the value of property, including but not limited to the matters listed in Sections 815 to 821[8] . . . ." (*Ibid.*) Third, the opinion cannot be grounded in any matter which the constitutional, statutory or decisional law declares to be an improper basis for an opinion. (§ 814; Cal. Law Revision Com. com., reprinted at 29B, pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 801, p. 21.)

Santa Fe states that the question of admissibility of an expert opinion is addressed to the discretion of the trial court. That statement is correct, as far as it goes. But admissibility rides on the extent to which the opinion is influenced by improper considerations. The court has discretion to exclude opinion testimony "that is based in whole or in significant part on matter that is not a proper basis for such an opinion. In such case, the witness may, if there remains a proper basis for his opinion, then state his opinion after excluding from consideration the matter determined to be improper." (§ 803.)

The Evidence Code valuation provisions do not specify the method for valuing an easement. (*County Sanitation Dist.* v. *Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1279 [22 Cal.Rptr.2d 117].) Santa Fe does not and cannot dispute that the ATF method is used by experts to ascertain rent for transportation corridor easements. In addition, the ATF method is itself a variation of the sales comparison approach (§ 816), typically used to estimate the value of land. Moreover, case law supports the use of ATF-related methods to value property. (See *People* ex rel. *Dept. of Transportation* v. *Southern Pac. Transportation Co.* (1978) 84 Cal.App.3d 315, 327 [148 Cal.Rptr. 535].) Thus, the ATF method in general would not constitute an improper basis for an opinion.

The trial court ended up rejecting all of Southern Pacific's exhibits related to the ATF valuation, as well as reports it tendered in response to the court's redirection of the trial. Its decision did not result from sound application of section 803, which would have led to identifying proper and/or improper bases for the railroad's opinion. Rather, it resulted from the forced

---

[8]They are: sale price (§ 815); sale price of comparable property (§ 816); rental value and lease terms (§ 817); rental value of comparable property (§ 818); capitalized value of reasonable net rental value (§ 819); improvements (§ 820); and improvements to vicinity (§ 821).

imposition of a comparable rent approach and the blanket attribution of the ATF process as a "self-serving system of valuation" producing, over the decades, "an inflated set of values . . . ."

We are not ruling on the actual admissibility of each item of Southern Pacific's documentary ATF evidence. That is to say, the railroad's particular application of the ATF method may or may not harbor "self-serving" features that lead to inflated values. The very point is that just as the court thwarted any interpretive effort to discern whether the ATF method exemplified the parties' contractual choice, so too it never applied section 803 to delve into the bona fides of the railroad's valuation reports. It acted on its own to exclude this evidence.

The court's unjustified undermining of Southern Pacific's planned case-in-chief, culminating in denial of the railroad's right to offer relevant evidence on the material issue of ascertaining the rent increase, if any, "in accordance with the fair market value of the easement," amounted to denial of a fair trial. (See 3 Witkin, Cal. Evidence (3d ed. 1986) § 1681, pp. 1642-1644; *Kelly* v. *New West Federal Savings* (1996) 49 Cal.App.4th 659, 677 [56 Cal.Rptr.2d 803] [effect of granting *in limine* motions was to prevent plaintiffs from offering evidence to establish their case; this exclusionary error, resulting in denial of a fair trial, was reversible per se].)

We reverse the judgment.

Hanlon, P. J., and Sepulveda, J., concurred.

The petition of appellant Santa Fe Pacific Pipelines, Inc., for review by the Supreme Court was denied December 15, 1999.