Filed 3/2/22  Silva v. City of L.A. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KILDARE LIMA SILVA,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES et al.,<br><br>        Defendants and Respondents. | B308601<br><br>(Los Angeles County<br>Super. Ct. No. BC696664) |

APPEAL from judgments of the Superior Court of Los Angeles County.  Ruth Ann Kwan, Judge.  Affirmed.

Choulos, Choulos & Wyle, George V. Choulos; Law Office of Gary Simms, Gary L. Simms; Matthew J. Kita; Law Office of Scott Righthand and Scott D. Righthand for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Deputy Assistant City Attorney, Scott Marcus, Senior Assistant City Attorney, Blithe S. Bock, Managing Assistant City Attorney and Sara Ugaz, Deputy City Attorney for Defendant and Respondent City of Los Angeles.

Wood, Smith, Henning & Berman, Nicholas M. Gedo, Victoria L. Ersoff and Zachary C. Hansen for Defendant and Respondent Shelter Clean Services, Inc.

_____

While riding on Ballona Creek Bike Path (Bike Path), Kildare Lima Silva (Silva) encountered uneven asphalt, lost control of his bike, and suffered personal injuries that rendered him a quadriplegic. A negligence lawsuit ensued. The trial court granted summary judgment for City of Los Angeles (City) based on the absolute trail immunity in Government Code section 831.4, subdivision (b).[1] It also granted summary judgment for Shelter Clean Services, Inc. (Shelter Clean), a contractor for City responsible for keeping the Bike Path swept and clear, due to the absence of a duty to protect third parties from harm caused by the Bike Path's uneven surface.

We affirm.

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

2

## FACTS[2]

### Ballona Creek Bike Path

In the 1970's, the Los Angeles County Flood Control District (District) entered into multiple agreements with City to develop "bicycle facilities on District rights of way." Agreement 28424 referred to "FUTURE RECREATIONAL FACILITIES," and Agreement 34220 stated that the United States Army Corps of Engineers (Army Corps of Engineers) had initiated a cost-sharing program "for the recreational development of certain flood control rights of way," and that it proposed a budget of $590,000 "for the construction of a bicycle trail on District rights of way for Ballona Creek, provided matching funds are available from local agencies." Agreement 34222 was referred to as a "RECREATIONAL AGREEMENT," and it stated that the Army Corps of Engineers intended to construct "a bicycle trail on District rights of way for Ballona Creek[.]" It also stated that District, as owner of the property, would act as the lead agency for the cost-sharing program, and that once the Bike Path was completed and accepted, City agreed to be responsible for police protection and security of the bikeway within City's boundaries, and that City further agreed to maintain or arrange for maintenance of the bikeway and landscaping.

---

[2]      Our statement of facts includes evidence of City's and Shelter Clean's understanding of their contractual relationship. We recognize that a party's undisclosed understanding of a contract is irrelevant to contract interpretation. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.) This evidence provides context for the conduct of City and Shelter Clean.

The Bike Path is approximately seven miles long and spans from Culver City to the Ballona Wetlands near Marina Del Rey. About two and a half miles of the Bike Path run through City from Sepulveda Boulevard to Lincoln Boulevard. The Bike Path has many cracks. It is nonirrigated, and City's jurisdiction is limited to the Bike Path's 12-foot-wide asphalt surface as well as the railing between it and the creek. Based on its use contract with Los Angeles County, City's jurisdiction does not include the vegetation or trees adjacent to the Bike Path.

The Bike Path is a class I bikeway.[3] It leads to the beach.

**Shelter Clean's Contract with City**

In response to a request for proposal (RFP) from City, Shelter Clean submitted a proposal (Proposal) on May 9, 2014, to provide City with management and performance of landscaping[4] and maintenance services for its bike path facilities. City accepted Shelter Clean's proposal, and they entered a contract signed in September 2014 (Contract) that incorporated the RFP and Proposal, and which included an appendix containing the "Standard Provisions for City Contracts." Paragraph 3.6 of the Contract provided: "CONTRACTOR shall monitor CITY Bike Path Facilities, as specified in the RFP, and report to CITY Staff

---

[3] "Bike paths or shared use paths, also referred to as 'Class I bikeways,' . . . provide a completely separated right-of-way designated for the exclusive use of bicycles and pedestrians with crossflows by motorists minimized." (Sts. & Hy. Code, § 890.4, subd. (a).) The Bike Path is a "completely off-street network that is not open to public vehicular traffic and it is for the exclusive use of bicycles and pedestrians."

[4] While some bike path facilities have landscaping that City must maintain, the Bike Path does not.

4

immediately any emergency situations that occur."  The Proposal had a section entitled "Activities" that contained a subsection entitled "Bike Path Facility Inspectors" with references to a "Senior Bike Path Inspector" and an "Assistant Inspector."  Per that section, the inspectors "will report on an Inspection Checklist for each sector inspection," "monitor and report any problems," "attempt to remove graffiti as it is seen and correct other problems during the regular inspections if time allows."  The "property inspections will include the following:  [¶]  . . .  [¶] Condition of asphalt; potholes, cracks; etc."  Also, the property inspections will include bike path sweeping and trash; theft of drain covers, backflow devices, and other salvageable metal items; general landscape and irrigation; condition of nonirrigated and nonserviced vegetation; graffiti on walls, signs, etc.; suspicious activity; subcontractor activity; homeless encampments; and illegal dumping.

The Contract specified that for purposes of project management, Alan Mudge (Mudge) was the principal in charge who "shall assume ultimate responsibility for, and participate in, all activities."

## City's Understanding of the Contract and Expectations of Shelter Clean

Abbass Vajar (Vajar),[5] a Transportation Engineer for City's Department of Transportation, considered Shelter Clean

---

[5]     Vajar represented City at a deposition as, inter alia, its "person most qualified to discuss . . . contracts with private entities for the upkeep, repair[], and maintenance of [the Bike Path] and the adjacent areas;" the person most qualified regarding City's placement of signs to warn bike riders of uneven pavement on the Bike Path; and the person most qualified to

5

responsible for clearing branches and twigs from the trail. If a tree fell and impeded that Bike Path, then Shelter Clean was authorized to remove it immediately. He expected Shelter Clean to report a hazard such as a sinkhole, a fallen tree or boulder blocking the Bike Path, or a fallen railing. Vajar did not expect Shelter Clean to report cracks in the asphalt to City. Nor did he expect Shelter Clean to patch or report a crack the size of the one that Silva's attorney showed him at his deposition.[6] Based on his understanding, the Contract did not require Shelter Clean to cut tree roots under the asphalt. With respect to the Bike Path, Shelter Clean's obligations under the Contract were coextensive with, and limited to, the area of City's jurisdiction over the asphalt and railing.

A City Transportation Engineering Associate 3 named Edward Giron (Giron) understood that Shelter Clean's job was to inspect for obstructions. Shelter Clean did not perform asphalt repair. City asked Shelter Clean "just to keep the path over the asphalt clear."

**Shelter Clean's Understanding of the Contract**

Mudge, the principal in charge for Shelter Clean, believed the company was supposed to inspect the overall condition of the asphalt for conditions that would make it impassable or unsafe.

---

discuss quarterly reports provided by Shelter Clean in accordance with the Contract.

[6] During his deposition, Vajar reviewed some photos. They depicted a branching crack that had a breadth of two-inches at its widest, and a depth of two-inches at its deepest. The full crack is not in the photo. It appears that the crack is at least five feet long.

To him, an unsafe condition would be something like a "gaping sink hole[.]"

**Conduct of City and Shelter Clean After They Entered into the Contract and Prior to Any Dispute**

A City employee inspected the entire length of Ballona Creek Bike Path at least once a month to ensure that Shelter Clean was, inter alia, sweeping and cleaning. City was aware that the Bike Path had cracks. It depended on Shelter Clean to inspect for debris, fallen trees, low branches, broken railings, and graffiti. Shelter Clean inspected for conditions that would make the Bike Path impassable. The only thing it ever reported was fallen trees. Shelter Clean did not notify City of upheavals in the asphalt.

If its employees observed a fallen tree blocking the Bike Path, they would cut the tree up and get it out of the way. City and Shelter Clean did not maintain the trees adjacent to the Bike Path. However, if branches from those trees were hanging too low over the Bike Path and creating a hazard, Shelter Clean would cut them.

At City's direction, Shelter Clean used cold asphalt to patch asphalt on City owned bike path facilities but it never performed that service on the Bike Path.[7] Cold asphalt is "a very temporary. . . Band-Aid patch[.]"

_____

[7] In his deposition, Vajar stated that Shelter Clean performed an asphalt patch on Ballona Creek Bike Path on one occasion at his direction. He later testified that he could not recall whether Shelter Clean did any asphalt patches on Ballona Creek Bike Path. Giron testified that he is not aware of Shelter Clean doing any asphalt patches there, and that he never made such a request. He asked Shelter Clean to perform asphalt patches on "other bike facilities that are owned by" City. The

7

City asked Shelter Clean to obtain estimates to repair asphalt on the Bike Path.[8]  In September 2015, Shelter Clean sent City a proposal from Del Rey Paving.[9]  City did not approve the Proposal.

Shelter Clean never placed warning signs on the Bike Path. A City employee put up a caution sign at one of City's bike path facilities.

After Silva's accident, Vajar did not ask Shelter Clean to repair the crack because it does not do major repairs.  It "only sweeps and maintains the surface of the roadway of the Bike Path[.]"  It never patched cracks like the one that caused Silva's accident because it was not an "expert in doing roadway surfaces or asphalt work," and that was not within the "capacity of [its] work[.]"

**The Accident**

On March 7, 2017, Silva was riding his bike to work on Ballona Creek Bike Path at a speed of approximately 15 to 20 miles per hour.  He "felt [his] front wheel hit uneven pavement and [he] was unable to steer to control [his] bicycle's direction

---

record contains photos of what appear to be two asphalt patches. They each involve a flat surface, i.e., a surface with no waves or bumps, and a patch on areas that measure in inches.  Jutting out from those patches are needle thin cracks.

[8]      Mudge testified that "a repair of asphalt would be possibly cutting out complete sections of it to repave."

[9]      The scope of the Proposal is not clear from the record.  Also, the record does not disclose what portions of the asphalt Del Rey Paving proposed to repair.

8

which caused [him] to be propelled headfirst into the metal railing."

He suffered permanent quadriplegia.

**Cause of the Uneven Surface**

Based on a visual inspection of the scene of the accident, Giron concluded that tree roots grew under the asphalt and caused cracks and waves.

Giron took photos. A photo of the overall area depicts a crack that appears to run 20 feet or so longitudinally down the middle of the Bike Path. The crack appears to have five perpendicular branches, three extending right and two extending left. The branches are about four to six feet long. Based on the photo, the widest crack is one of the three perpendicular cracks extending to the right. The asphalt is uneven with bumps or waves where it rises and dips.[10]

**The Operative Pleading**

In the first amended complaint, Silva sued City, other public entities, a paving contractor and Doe defendants for premises liability and general negligence. He substituted Shelter Clean as Doe 1.

**Summary Judgment for City**

<u>Moving Papers</u>

City sought summary judgment based on the argument that the Bike Path qualifies as a "trail" used for a purpose such as "riding," and that section 831.4, subdivision (b) therefore

---

[10] The parties contend that the crack was widest along its longitudinal line. Whether the crack was widest along a longitudinal line or a perpendicular line is not material to this appeal.

9

entitles City to absolute immunity for any injury caused by the condition of the Bike Path.

Opposing Papers

To defeat summary judgment, Silva argued: City is not entitled to absolute immunity under section 831.4, subdivision (b) if it did not comply with the Streets and Highway Code when developing the Bike Path, and there is a triable issue as to whether it complied. Regardless, any time a paved trail is on an easement of way[11] leading to unimproved property such as the beach, a public entity's liability with respect to injury caused by a condition of that paved trail is governed exclusively by section 831.4, subdivision (c). Under section 831.4, subdivision (c), a public entity has immunity on the condition that it reasonably attempted to warn users of a hazard. Here, there is a triable issue as to whether City reasonably attempted to provide the Bike Path users with a warning.

Ruling

The trial court granted summary judgment for City, reasoning that the Bike Path was a trail covered by section 831.4, subdivision (b) because it is used for "riding," and City was entitled to absolute immunity. The trial court rejected Silva's arguments that the Streets and Highway Code created an exception to immunity and that City accepted an easement of way in a manner that would trigger the application of section 831.4, subdivision (c).

---

[11]    "'A grant in general terms of an easement of way will ordinarily be construed as creating a general right of way[.]'" (*Laux v. Freed* (1960) 53 Cal.2d 512, 525.)

**Summary Judgment for Shelter Clean**

<u>Moving Papers</u>

Shelter Clean moved for summary judgment or, in the alternative, summary adjudication. Per Shelter Clean, the premises liability cause of action lacked merit because it did not own, control or possess the Bike Path. As to the general negligence claim, Shelter Clean argued that any duty of care it owed was limited in scope by the terms of the Contract, and that it did not have a contractual duty to repair the asphalt, perform landscaping, maintain the roots from the adjacent property, perform inspections for the type of condition that Silva alleged caused his accident and injuries, or warn Silva of that specific condition.

<u>Opposing Papers</u>

In his opposition, Silva argued that Shelter Clean is subject to premises liability because it exercised control over the Bike Path under the Contract, and that it owed Silva a duty to report hazardous conditions based on the obligations that it assumed under the Contract as well as the rule that all persons are required to use ordinary care to prevent others from being injured by their conduct. Also, Shelter Clean owed Silva a duty to fix the crack or warn him.

Silva submitted an expert declaration from Brad Avrit (Avrit), a civil engineer. He opined that "the subject area constituted a fundamentally dangerous condition of public property," and that Shelter Clean "failed to make any repairs or note any sections where repairs were necessary and therefore failed to fulfill [its] contractual maintenance work with [City]. Performing cold AC patching, for example, would have eliminated the dangerous condition." Avrit interpreted the Contract as

11

requiring Shelter Clean to "remedy the subject cracking in the asphalt, alert [City] to the existence of the subject cracking, or subcontract the repair work to another company better suited to the Bike Path's maintenance." Robert Shanteau (Shanteau), a professional traffic engineer, supplied another expert declaration. He stated, "[E]ven if reporting and repairing the hazardous condition were not specifically named duties in the [Contract], as City's maintenance contractor, Shelter Clean should still have notified City of the hazard so that the City could address it. Reporting hazardous conditions is part of maintenance in general."

Ruling

The trial court granted Shelter Clean's motion for summary judgment. According to the trial court, Shelter Clean was not subject to premises liability because it did not own, possess, or control the Bike Path. With respect to general negligence, the trial court explained that Shelter Clean did not owe a duty of care either based on the Contract or public policy pursuant to *Rowland v. Christian* (1968) 69 Cal.2d 108, 117 (*Rowland*). The trial court relied on its determination that Shelter Clean did not have the power or right to act on the hazard by reporting it, placing warnings around it, or repairing it, and it therefore did not have the power or right to remedy the hazard. It specifically concluded the *Rowland* factors "militate against a finding that Shelter Clean had a duty to inspect and act on subject hazard," and that it did not have a duty to post warnings about the crack.

**Silva's Appeals**

Silva appealed from both summary judgments.

12

**DISCUSSION**

## I. Standard of Review.

When reviewing summary judgment, we "determine de novo whether a triable issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law. [Citation.]" (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139.) Our task is to "consider all of the evidence and all of the inferences reasonably drawn therefrom," and to view "such evidence in the light most favorable to the opposing party. [Citation.]" (*Ibid.*) A triable issue of fact exists only if a trier of fact could reasonably conclude under the applicable standard of proof that a contested fact in favor of the opposing party is established. (*Ibid.*)

"On appeal from a summary judgment based on a trial court's interpretation of a contract, we are not bound by that interpretation (1) if there is no extrinsic evidence concerning its interpretation, (2) if there is no conflict in such evidence, or (3) . . . the conflicting extrinsic evidence is of a written nature only." (*Department of Forestry & Fire Protection v. Lawrence Livermore National Security, LLC* (2015) 239 Cal.App.4th 1060, 1066.)

## II. Summary Judgment for City.

Section 831.4[12] establishes that a public entity "is not liable for an injury caused by a condition of:

"(a) Any unpaved road which provides access to fishing, hunting, camping, hiking, riding, including animal and all types

---

[12] Silva requests that we take judicial notice of letters and bill reports in the legislative history of section 831.4. The request is hereby granted.

of vehicular riding, water sports, recreational or scenic areas and which is not a (1) city street or highway or (2) county, state or federal highway or (3) public street or highway of a joint highway district, boulevard district, bridge and highway district or similar district formed for the improvement or building of public streets or highways.

"(b) Any trail used for the above purposes."

Silva's injuries were caused by a condition of the Bike Path, which is a class I bikeway.  A class I bikeway "is a 'trail' within the definition of section 831.4, subdivision (b)." (*Farnham v. City of Los Angeles* (1998) 68 Cal.App.4th 1097, 1101 (*Farnham*); see also *Carroll v. County of Los Angeles* (1997) 60 Cal.App.4th 606, 607; *Armenio v. County of San Mateo* (1994) 28 Cal.App.4th 413, 417.)  City is entitled to absolute immunity and summary judgment was proper.

Pushing back, Silva argues that City is not entitled to immunity unless it attempted to warn the public of the hazard, as required in section 831.4, subdivision (c).  That subdivision provides that a public entity is not liable for an injury caused by a condition of "[a]ny paved trail . . . on an easement of way which has been granted to a public entity, which easement provides access to any unimproved property, so long as such public entity shall reasonably attempt to provide adequate warnings of the existence of any condition of the paved trail, walkway, path, or sidewalk which constitutes a hazard to health or safety." (§ 831.4, subd. (c).)

Silva argues that the Bike Path is on an easement of way because it was built on the District's right of way leading to the beach, which is unimproved property.  He contends that City's liability is governed by section 831.4, subdivision (c), and that

14

there is a triable issue as to whether City reasonably attempted to provide a warning of the crack.[13]

In essence, Silva argues that the warning requirement in section 831.4, subdivision (c) applies to subdivision (b) whenever a trail is on an easement of way leading to unimproved property. But as *Farnham* noted, "The Legislature could have easily chosen to make subdivision (b)'s 'any trail' subject to the same warning requirements of subdivision (c) and opted not to do so[.]" (*Farnham*, *supra*, 68 Cal.App.4th at p. 1102.) Moreover, "Legislative history indicates . . . that [section 831.4], subdivision (c), which was enacted after subdivisions (a) and (b) [citation], was not intended to limit existing immunity in any way, but rather to expand it. [Citations.] No intent to limit the meaning of a 'trail' under subdivision (b) is apparent in the enactment of subdivision (c) of section 831.4." (*Amberger-Warren v. City of Piedmont* (2006) 143 Cal.App.4th 1074, 1082.)

In any event, we do not accept that the Bike Path is on an easement of way. *Prokop v. City of Los Angeles* (2007) 150 Cal.App.4th 1332 (*Prokop*) held that a class I bikeway running along the Los Angeles River was "clearly not an easement of way for access to unimproved property." (*Id*. at p. 1342.) The trial court observed that the exclusive emphasis of section 831.4,

---

[13]     The portion of the Bike Path operated by City runs from Sepulveda Boulevard to Lincoln Boulevard, and neither boulevard qualifies as unimproved property. Even if Silva is correct that the Bike Path continues past Lincoln Boulevard and ends at the beach, access to the beach is not provided by the easement granted to City. Rather, it is provided by a different portion of the District's right of way. For our analysis, this is a moot point. As we discuss, section 831.4, subdivision (c) simply has no application to this case.

15

subdivision (c) is access (*id*. at p. 1342), tacitly determining that the main purpose of a class I bikeway is recreation. Silva argues that *Prokop* is distinguishable because the class I bikeway in that case did not lead to unimproved property whereas the Bike Path leads to the beach. We find the distinction immaterial. Even though the Bike Path leads to the beach, Agreement 28424, Agreement 34220, and Agreement 34222 refer to future recreational facilities, recreational development, and bicycle facilities, and the last of those agreements was referred to as "RECREATIONAL AGREEMENT." None of these agreements refer to the beach or unimproved property. The exclusive emphasis of the Bike Path is recreation. Aside from that, we decline to treat one class I bikeway different than the next simply based on where each begins or ends.

## III. Summary Judgment for Shelter Clean.

Contrary to what Silva argues, Shelter Clean did not have either a contractual or a noncontractual duty to inspect for the crack, report the crack to City, or warn the public about the crack with a sign or caution tape.

When an independent contractor assumes a contractual duty, public policy may dictate that it owes a duty to use ordinary care to prevent a third party from being injured due to their conduct. (*De Lima v. Magnesite Waterproofing & Refinishing* (1987) 191 Cal.App.3d 776, 782.)

To determine Shelter Clean's contractual duties, we must engage in contract interpretation, the rules of which task a court with determining the parties' mutual intent. The language of a contract governs its interpretation if the language is clear and explicit. But if the language is ambiguous because it is reasonably susceptible to more than one meaning, parol evidence

16

is admissible to aid interpretation. A court can consider, inter alia, the whole contract when construing select language; the circumstances under which a contract was made; the course of dealing between the parties; and the custom and practice in the industry. (*Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1240–1241; *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 72–73; *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.* (1988) 205 Cal.App.3d 442, 451.) Parol evidence can be considered to resolve patent ambiguities as well as to reveal and resolve latent ambiguities. (*Zissler v. Saville* (2018) 29 Cal.App.5th 630, 644.) When the parties did not agree to the meaning of terms, "the conduct of the parties after the execution of the contract, and before any controversy arose, may be considered in order to attempt to ascertain the parties' intention." (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1449.)

The Contract does not require Shelter Clean to place warnings, be they signs or caution tape. With respect to Shelter Clean's duty to inspect and report, the Contract is ambiguous. While it requires Shelter Clean to inspect for cracks, it does not clarify the type of cracks. The Contract provides that Shelter Clean must report emergency situations and problems, but it does not define those terms.

To aid interpretation, Shelter Clean offered evidence of the postcontract, predispute conduct of itself and City. That evidence revealed that City inspected the Bike Path once a month. Shelter Clean removed and reported fallen trees, it trimmed branches, and kept the Bike Path free of other debris. It did not maintain roots. It did not repair or report cracks and uneven asphalt. On

occasion, it patched small cracks with cold asphalt (albeit at different bike path facilities) when City made a request. If a warning was necessary, City posted it. The evidence establishes that emergency situations and problems subject to being reported were situations such as fallen trees making the Bike Path impassable, and that Shelter Clean was not required to put up warnings. While a crack or pothole impeding passage on the Bike Path would fit the definition of an emergency situation or problem, a crack the size of the one that caused Silva's accident did not.

To show a triable issue, Silva adverts to the declarations of Avrit and Shanteau. They did not, however, offer evidence of custom and practice in Shelter Clean's industry regarding what kind of cracks it should inspect for or the meaning of "emergency situation" or "problems." Rather, they simply offered opinions on what Shelter Clean should have done. This evidence is not extrinsic evidence we can consider. Insofar as Silva offers these declarations as expert opinions on the meaning of the Contract, the declarations must be ignored. Contract interpretation is a question of law for the courts. For that reason, "[e]xpert opinion on the legal interpretation of contracts has . . . been found to be inadmissible[.]" (*Summers v. A .L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1180 (*Summers*); *In re Tobacco Cases* (2010) 186 Cal.App.4th 42, 51 ["the interpretation of contractual language is a legal matter for the court"]*; Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 921.)[14]

_____

[14] *Summers* identifies *Neal v. Farmers Insurance Exchange* (1978) 21 Cal.3d 910 (*Neal*) as the "one possible exception to the rule against expert opinion on issues of law," but then explains that "[c]lose scrutiny of the court's decision in *Neal* reveals it

18

We next examine whether Shelter Clean owed Silva any duties based on noncontract principles.

Each person "is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person[.]"  (Civ. Code, § 1714, subd. (a).)  "The conclusion that a defendant did not have a duty constitutes a determination by the court that public policy concerns outweigh, for a particular category of cases, the broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143 (*Kesner*).)  In determining whether policy considerations weigh in favor of an exception to the general rule, the most important factors have been listed by our Supreme Court:  foreseeability of the harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise due care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.  (*Kesner, supra*, 1 Cal.5th at pp. 1149–1150, citing *Rowland*.)

When a court is deciding whether a party has a legal duty, "a distinction is drawn between claims of liability based upon misfeasance and those based upon nonfeasance."  (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1202 (*Seo*).)  "Liability for misfeasance is based on the general duty of

_____

actually involved an expert opinion on a factual issue rather than a legal one[.]"  (*Summers, supra*, 69 Cal.App.4th at p. 1180.)

ordinary care to prevent others from being injured by one's conduct. [Citations.] Liability for nonfeasance is limited to situations in which there is a special relationship that creates a duty to act. [Citations.]" (*Ibid.*) The general rule is that no one has a duty to come to the aid of another. Thus, a person who has not created a peril is not liable in tort for the mere failure to take affirmative action to assist or protect another. "Because the traditional weighing process using the seven factors set forth in [*Rowland*] 'has already been done by courts over the centuries in formulating that "no duty to aid" rule' in the context of liability for nonfeasance, it is not necessary to engage in the weighing process in a particular case. [Citation.]" (*Seo*, *supra*, 97 Cal.App.4th at p. 1203.)

The threshold question is whether the claims against Shelter Clean are based on malfeasance or nonfeasance. We conclude that it is the latter.

As alleged in Silva's first amended complaint, City "had notice both actual and constructive" of the dangerous condition and "recklessly disregarded" it. City's agreements with District obligated it to maintain the Bike Path, and a City employee inspected the Bike Path at least once a month. Although City sought a proposal for fixing asphalt somewhere on the Bike Path, it rejected the Proposal. While City could have hired someone to inspect for and report and repair cracks such as the one at issue, it did not do so. City is responsible for the management of the condition of the asphalt and is, accordingly, responsible for the existence of the crack. The bottom line is that Shelter Clean did not create the peril, and it did not have a duty to take affirmative action to protect the public.

20

Shelter Clean can be held liable only if it had a special relationship with Silva.  But that is not Silva's theory of liability, which brings our analysis to a close.

All other issues are moot.

## DISPOSITION

The summary judgments entered in favor of City and Shelter Clean are affirmed.  City and Shelter Clean shall recover their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT


21