Filed 6/23/16  Northrop Grumman Systems Corp. v. Goldentop Road CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NORTHROP GRUMMAN SYSTEMS CORPORATION,  Plaintiff and Respondent,  v.  GOLDENTOP ROAD, LLC,  Defendant and Appellant. | D067241   (Super. Ct. No. 37-2013-00044542-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Affirmed.

Manatt, Phelps & Phillips, Craig J. de Recat, John W. McGuinness and Benjamin G. Shatz for Defendant and Appellant.

Horvitz & Levy, Jeremy B. Rosen, Steven S. Fleischman; McDermott Will & Emery and Chris C. Scheithauer for Plaintiff and Respondent.

Northrop Grumman Systems Corporation (Northrop) is the lessee and Goldentop Road, LLC (Goldentop) is the lessor of real property in the Rancho Bernardo area of San

Diego, California. After Northrop exercised its option under a written lease agreement to extend its tenancy, Northrop and Goldentop were unable to agree on the rental rate for the extension. Northrop and Goldentop engaged in a broker appraisal process under the lease agreement to set the rental rate. After this process was completed, Northrop and Goldentop could not agree as to how, or whether, the results would affect the rental rate for the extension. Several months later, Northrop filed a complaint in the trial court. The complaint consisted of (1) a petition to confirm the result of the broker appraisal process as an arbitration award and (2) two causes of action for declaratory relief regarding Northrop's past and future rent obligations under the extension of the lease agreement. The trial court granted Northrop's petition to confirm an arbitration award and, on that basis, granted summary judgment in Northrop's favor on its causes of action for declaratory relief.

Goldentop appeals the ensuing judgment. Goldentop contends that the trial court erred by (1) finding that the broker appraisal process was an arbitration, (2) confirming the results of that process as an arbitration award, and (3) granting summary judgment based on an erroneous interpretation of the lease agreement. We conclude that the broker appraisal process was an arbitration and that the trial court properly confirmed the results of that process as an arbitration award. We further conclude that the trial court did not err in interpreting the lease agreement or in granting summary judgment in Northrop's favor. We therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2000, Northrop entered into a written lease agreement with Goldentop's predecessor-in-interest. The lease agreement had a term of seven years and specified an amount certain as "Base Rent" to be paid monthly. The lease agreement provided for increases in the Base Rent every two years. In addition to Base Rent, the lease agreement provided for payments by Northrop for insurance, maintenance, taxes, and other items, which the lease agreement defined as "Additional Rent." The lease agreement also provided for broker's fees, to be determined by separate agreement. An exhibit to the lease agreement described a tenant improvement allowance ("Improvement Allowance"), which the lessor was obligated to pay Northrop under certain circumstances, to fund improvements to the property.

Section 3.4 of the lease agreement gave Northrop the option to renew the lease on specified terms: "Lessee shall . . . have three (3) successive options to renew this Lease for a term of five (5) years, on the same terms and conditions set forth in the Lease, except as modified by the terms, covenants and conditions as set forth below[.]" The additional terms described an "increase" in the Base Rent for the renewal term: "[T]he annual Base Rent and monthly installments in effect at the expiration of the then current term of the Lease shall be increased, commencing on the first day of the renewal term, to reflect ninety-five percent (95%) of the Fair Market Rental Rate (as hereinafter defined)." The lease agreement defined Fair Market Rental Rate as "the annual amount per rentable square foot that a willing, new, non-renewal, non-equity, non-expansion tenant will pay for comparable space and landlord would accept, at arm's length, giving appropriate

3

consideration to annual rental rates per rentable square foot, escalation (including type, gross or flat and if gross, whether, base year or expense 'stop'), and abatement provisions reflecting free rent and/or no rent during the period of construction or any period during the lease term, brokerage commissions, if any, length of the Lease term, size and location of premises being leased, building standard work letter and/or tenant improvement allowance, if any, and other generally applicable terms and conditions of tenancy for comparable space in comparable buildings ('comparable Leases')."

If the parties could not agree on a Fair Market Rental Rate for the renewal term, the lease agreement required an appraisal process involving real estate brokers who would set the Fair Market Rental Rate:  "If Lessee does not agree with Lessor's opinion of the Fair Market Rental Rate within thirty (30) days after Lessee delivers the Option Notice, then within ten (10) days thereafter, each party . . . shall appoint a real estate broker ('Broker') . . . to appraise and set the Fair Market Rental Rate. . . .  If the two (2) Brokers are appointed by the parties as stated in this Section, they shall meet promptly and attempt to set the Fair Market Rental Rate.  If they are unable to agree within thirty (30) days after the second Broker has been appointed, they shall attempt to elect the third Broker . . . .  Each of the parties shall bear one-half (1/2) of the cost of appointing the third Broker and of paying the third Broker's fee. . . .  Within thirty (30) days after the selection of the third Broker, a majority of the Brokers shall set the Fair Market Rental Rate.  If a majority of the Brokers are unable to set the Fair Market Rental Rate within such thirty (30) day period, the three (3) appraisals shall be added together and their total divided by three (3); ninety-five percent (95%) of the resulting quotient shall be the Basic

4

[*sic*] Rent. The Brokers engaged to approve the Fair Market Rental Rate shall not receive a commission, but shall be paid on an hourly basis."

At the end of the initial lease term, Northrop sought to extend the lease agreement for an additional five year term. Northrop and Goldentop agreed on a Fair Market Rental Rate, which resulted in an increased Base Rent. Northrop and Goldentop entered into an amendment to the lease agreement, documenting the extension term. The amendment contained, among other provisions, the following two recitals: (1) "Section 3.4 of the Lease provides Tenant with the option to extend the term of the Lease, with the Base Rent set at ninety-five percent (95%) of the Fair Market Rental Rate as defined therein, and otherwise on the same terms and conditions set forth in the Lease." (2) "Tenant has exercised such extension option and the parties have determined the appropriate Base Rent in accordance with the provisions of Section 3.4 of the Lease. This Amendment modifies the Lease to document such extension term." The amendment specified an agreed-upon Fair Market Rental Rate and, based on that figure, a Base Rent. The amendment also provided for yearly increases in the Base Rent and a 4 percent commission for Northrop's brokers.

At the end of the first renewal term, Northrop exercised its option to extend the lease agreement for a second renewal term. In accordance with the lease agreement, Goldentop proposed $1.65 per square foot per month as the Fair Market Rental Rate. Goldentop's proposal would result in the same Base Rent as was in effect during the last year of the first renewal term. Northrop disagreed with Goldentop's proposal and, as set

5

forth in the lease agreement, appointed a broker to appraise the Fair Market Rental Rate. Goldentop appointed a broker as well.

The two brokers appointed by the parties were unable to agree on a Fair Market Rental Rate. Pursuant to the lease agreement, they identified a third broker, Warren "Jay" Arnett, to appraise the Fair Market Rental Rate. Arnett entered into an "Agreement for Professional Consulting Services" with Northrop and Goldentop. Arnett's agreement stated that Northrop had exercised its renewal option, that "the rental rate for that renewal period is to be 95% of Fair Market Value," and that because Northrop and Goldentop "have not agreed to a rental rate, in accordance with Lease Article 3.4(c), to resolve this disagreement, [Northrop and Goldentop] have agreed to contract with a Consultant . . . ." An exhibit to Arnett's agreement described his assignment as follows: "Consultant has been hired to prepare a written Fair Market Rental Rate (FMRR) analysis, to be delivered to each Client [i.e., Northrop and Goldentop] separately and at the same time, and act as the third party arbiter for the Lease . . . ."

Goldentop's broker sent Arnett his Fair Market Rental Rate analysis for the property. Goldentop's broker concluded that the Fair Market Rental Rate was $1.68 per square foot per month. In addition, he noted, "Fair Market rental inducements outlined in the lease that apply will be as follows: [¶] • 1 month of rental abatement [¶] • 3% annual increases in the Base Rental Rate [¶] • Five dollar ($5.00) per square foot of office space only (approximately $150,000 total)[.]"

After forming some preliminary thoughts, Arnett solicited input from the brokers for Northrop and Goldentop. Arnett then prepared a final report entitled "Consultation

6

for: Fair Market Rental Rate[,] Third Party Broker." The report assessed the facilities and improvements on the property, market conditions, and comparable lease terms. Arnett concluded that the Fair Market Rental Rate was $1.10 per square foot per month, with 3 percent annual increases, $8.00 per square foot tenant improvement allowance per month, four and one-half months' rental abatement, and broker commissions of 6 and 1/2 to 7 percent. Northrop's broker provided notice under the lease agreement that he agreed with Arnett's opinion. Arnett's opinion therefore enjoyed majority support.

After receiving Arnett's final report, Goldentop wrote to Northrop, describing the process as "an interesting exercise for the brokers involved." Goldentop explained its view that the language of the lease agreement required that the Base Rent for any extension could only be increased, not decreased, from the prior Base Rent. Because applying Arnett's Fair Market Rental Rate opinion would result in a decrease in the Base Rent, it could have "no impact on the contractual obligations of the parties going forward." Goldentop believed that under the terms of the lease agreement, the Base Rent for the extension would be the same as the last Base Rent for the prior extension. Northrop responded by letter, explaining that it disagreed with Goldentop's position but that it would make rental payments as demanded by Goldentop for the extension term under protest and with full reservation of rights.

Approximately nine months later, Northrop filed its complaint in this action. Northrop's operative first amended complaint (FAC) consisted of a petition to confirm an arbitration award (Arnett's opinion) and two causes of action for declaratory relief regarding Northrop's past and future rent obligations.

7

In connection with its petition to confirm an arbitration award, Northrop argued that the lease agreement's broker appraisal process was a binding arbitration and that Arnett's conclusions constituted its award. Northrop urged the trial court to confirm the award, including all of its components (i.e., rent per square foot, annual increases, tenant improvement allowance, rental abatement, and broker commissions). Goldentop opposed, contending that the broker appraisal process was not an arbitration. Even if it were an arbitration, Goldentop argued, Arnett had not determined what the Base Rent should be under the lease agreement and any award should be limited to Arnett's opinion that the Fair Market Rental Rate was $1.10 per square foot per month.

The trial court granted Northrop's petition to confirm Arnett's conclusions as an arbitration award. The court found that the broker appraisal process was a binding arbitration and that Goldentop's challenges to Arnett's award were untimely.

Northrop moved for summary judgment (or in the alternative, summary adjudication) on its declaratory relief causes of action and for entry of judgment on the confirmed arbitration award. Northrop's first declaratory relief cause of action sought a declaration regarding the rent that Northrop would be obligated to pay during the extension period. Northrop argued that Arnett's opinion, as a confirmed arbitration award, provided the parameters for its rental payments going forward, including all of its components. Northrop's second declaratory relief cause of action sought a declaration regarding the amount that Northrop had overpaid in rent in the months since the extension began. Northrop argued that this amount should be the difference between the

rental payments determined by Arnett's opinion (including all of its components) and the rent that Northrop had actually paid.

In support of its motion, Northrop submitted declarations from several individuals, including A.J. Paz, Northrop's director of real estate. Paz participated in the original lease negotiations between Northrop and Goldentop's predecessor-in-interest. During these negotiations, Goldentop's predecessor-in-interest proposed language for the lease extension option provisions that read, in relevant part, as follows: "[I]n no event shall the annual rent and monthly installment for any option period be less than the annual rent and monthly installment in [the] preceding period." Northrop rejected that language, and it was not included in the lease agreement. Although the lease agreement contained language noting that the Base Rent "shall be increased" for the extension (option) period, Paz stated that he did not intend that language to mean that the Base Rent for the extension period could only increase. Instead, the Base Rent for the extension period would be calculated as 95 percent of the Fair Market Rental Rate, as determined under the terms of the lease agreement. Northrop also submitted a declaration from Arnett, who described his engagement and his conclusions.

In opposition, Goldentop argued that Arnett's powers under the lease agreement were limited to appraising the Fair Market Rental Rate and that his opinion could, at most, only be the first step in determining the rental rate for the lease extension period under the lease agreement. Goldentop argued that Arnett's opinion could not override the plain language of the lease agreement, which provided that the Base Rent "shall be increased" for the extension period. Goldentop also contended that Arnett's opinion

9

included components that were not properly included in the Fair Market Rental Rate (i.e., tenant improvement allowance, rental abatement, and broker commissions) and that Arnett's opinion could not rewrite the lease to incorporate those additional components into the monetary terms for the extension period. Goldentop argued that Northrop's evidence surrounding the lease negotiations was irrelevant and inadmissible. In support of its opposition, Goldentop submitted declarations from the president of Goldentop's parent company, a real estate expert, and Goldentop's counsel.

The trial court granted Northrop's motion for summary judgment. The court again determined that Goldentop's challenges to Arnett's opinion were untimely. The court overruled Goldentop's evidentiary objections to Northrop's declarations on the ground that Goldentop had previously sought judicial notice of the same or similar declarations in connection with Goldentop's earlier demurrer to Northrop's complaint. The court sustained various evidentiary objections to Goldentop's evidence and struck the declarations of its parent company's president and its real estate expert. The court issued a statement of decision supporting its order confirming Arnett's opinion as an arbitration award and entered judgment in favor of Northrop on all of its claims. Goldentop appeals.

## DISCUSSION

### I

Goldentop first argues that the trial court erred in determining that the lease agreement's broker appraisal process was an arbitration under California law.

(Code Civ. Proc., § 1280 et seq.)[1]  "Arbitration is not defined by any statute.  One appellate court surveyed the various definitions of arbitration and quoted from Black's Law Dictionary that arbitration is ' "[a] process of dispute resolution in which a neutral third party (arbitrator) renders a decision after a hearing at which both parties have an opportunity to be heard.  Where arbitration is voluntary, the disputing parties select the arbitrator who has the power to render a binding decision." ' "  (*Saeta v. Superior Court* (2004) 117 Cal.App.4th 261, 268 (*Saeta*).)  " '[A]lthough [an] arbitration can take many procedural forms, a dispute resolution procedure is not an arbitration unless there is a third party decision maker, a final and binding decision, and a mechanism to assure a minimum level of impartiality with respect to the rendering of that decision.' "  (*Ibid.*)  It is these hallmark attributes, not the label applied to the procedure, that determines whether a procedure is an arbitration.  "The fact that a procedure is labeled an 'arbitration' does not mean that it is . . . , and a procedure may constitute an arbitration even though it does not bear that characterization."  (*Elliott & Ten Eyck Partnership v. City of Long Beach* (1997) 57 Cal.App.4th 495, 503; see *Cheng-Canindin v. Renaissance Hotel Associates* (1996) 50 Cal.App.4th 676, 684 [label not determinative; " '[m]ore important is the nature and intended effect of the proceeding' "].)

California's arbitration statutes provide several examples of common dispute resolution procedures that fall within the statutory scope of an agreement to arbitrate: " 'Agreement' includes but is not limited to agreements providing for valuations,

---

[1]     Further statutory references are to the Code of Civil Procedure unless otherwise specified.

11

appraisals and similar proceedings . . . ."  (§ 1280, subd. (a).)  Thus, "[a]ppraisal hearings are a form of arbitration and are generally subject to the rules governing arbitration." (*Kacha v. Allstate Insurance Co.* (2006) 140 Cal.App.4th 1023, 1031; see *Lambert v. Carneghi* (2008) 158 Cal.App.4th 1120, 1129 (*Lambert*); *Appalachian Insurance Co. v. Rivcom Corp.* (1982) 130 Cal.App.3d 818, 824.)

The question whether the agreement at issue was an agreement to arbitrate under California law rests primarily on interpretation of the agreement itself.  (See *Saeta*, *supra*, 117 Cal.App.4th at p. 267.)  "The interpretation of a contract is subject to de novo review when construction does not turn on the credibility of extrinsic evidence.  [Citation.]  We are not bound by the trial court's interpretation of the agreement when the agreement is unambiguous."  (*Ibid.*)  Northrop asserts that we should review this issue for substantial evidence.  Our conclusion would be unchanged under Northrop's suggested standard of review.

The broker appraisal process is the procedure set forth in lease agreement to resolve disputes regarding the Fair Market Rental Rate for a renewal term.  The procedure begins with each party's selection of a real estate broker "to appraise [the property] and set the Fair Market Rental Rate."  If the two party-appointed brokers fail to agree, they are required to select a third broker.  The third broker must be an individual "who has not previously acted in any capacity for either party."  A majority of the three brokers then determines the Fair Market Rental Rate.

This procedure meets the minimum requirements of an arbitration under California law.  It is explicitly an appraisal process, which is included by statute within the scope of

12

agreements to arbitrate.  (§ 1280, subd. (a).)  Numerous authorities have determined that analogous appraisal processes are arbitrations.  (See, e.g., *Lambert*, *supra*, 158 Cal.App.4th at p. 1131; *Helzel v. Superior Court* (1981) 123 Cal.App.3d 652, 659; *San Luis Obispo Bay Properties, Inc. v. Pacific Gas & Electric Co.* (1972) 28 Cal.App.3d 556, 562; see also *Wasyl, Inc. v. First Boston Corp.* (9th Cir. 1987) 813 F.2d 1579, 1582.)  In addition, the procedure includes the hallmark aspects of arbitration:  a third party decision maker (the neutral third broker), a final and binding decision (the majority decision of the brokers, which sets the Fair Market Rental Rate), and a mechanism to assure a minimum level of impartiality (the qualifications of the brokers, the requirement that the party-appointed brokers agree on the third broker, and the fact that the third broker cannot have a relationship with the parties).  (See *Saeta*, *supra*, 117 Cal.App.4th at p. 268.)  The fact that the parties agreed to a procedure with these attributes shows that the parties intended to agree to arbitrate under California law.

Relying primarily on *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524 (*Coopers*), Goldentop points out that not all appraisals or valuations are arbitrations.  (*Id.* at p. 537 ["We hold [that] a mere agreement for a binding valuation is not per se an agreement to submit to arbitration.  Something more is required . . . ."].)  In *Coopers*, the appellate court considered whether an agreement providing for a binding audit by a third party accounting firm was an agreement to arbitrate as a matter of law.  (*Id.* at p. 527.)

The *Coopers* court concluded that an agreement for a binding audit could be an agreement to arbitrate, but the court could not conclude as a matter of law that the

13

agreement at issue reflected an intent to conduct an arbitration: "We conclude agreements to arbitrate include agreements providing for valuations, appraisals and similar proceedings, including audits. A formal hearing and the taking of evidence are not essential to arbitration, which alternatively may consist of a submission of a controversy to an independent examination. . . . [¶] However, while [the parties] agreed to be bound by Coopers' audit, because we cannot say as a matter of law their agreement reflected the intent to conduct an arbitration within the ambit of the statutory scheme, the trial court properly overruled petitioners' demurrer asserting arbitral immunity." (*Coopers*, *supra*, Cal.App.4th at pp. 527-528.) The court found that the applicable provision was ambiguous "with respect to whether the agreement is for a formal arbitration within the ambit of the Code, or for a mere binding audit." (*Id.* at p. 538.) The court believed that it had to credit plaintiffs' allegation regarding the meaning of the agreement (that it was not an agreement to arbitrate) in ruling on the sufficiency of plaintiff's complaint. (*Ibid.*) The court further found persuasive the facts that (1) Coopers, the purported arbitrator, had filed a prior suit as a third party beneficiary of the contract without mentioning arbitration and (2) no party had filed a petition to confirm, vacate, or correct the purported arbitration award. (*Id.* at pp. 538-539.)

*Coopers* has little relevance to our assessment of the broker appraisal process in the lease agreement at issue here. Unlike *Coopers*, we are not reviewing an order sustaining a demurrer. Also unlike *Coopers*, Northrop *did* file a petition to confirm the results of the broker appraisal process as an arbitration award. In addition, the binding audit process in *Coopers* was far different from the broker appraisal process here, which

14

more closely corresponds to the hallmark aspects of arbitration than did the audit in *Coopers*.

Goldentop points out that the lease agreement does not use the terms "arbitration" or "arbitrator" in describing the broker appraisal process. As we have noted, however, the lack of such description is not dispositive. (*Elliott & Ten Eyck Partnership v. City of Long Beach*, *supra*, 57 Cal.App.4th at p. 503.) Moreover, the parties did refer to the third broker (Arnett) as an "arbiter" in his consulting agreement and in an email during the appraisal procedure. While not the same term as "arbitrator," the fact that the parties referred to Arnett as an "arbiter" shows that they intended that he inhabit that type of decisionmaking role.[2]

In reply, Goldentop argues that the broker appraisal process cannot be an arbitration because it did not conclusively resolve the parties' dispute. Goldentop claims that the parties' dispute was centered on the Base Rent for the lease renewal term, but that the broker appraisal process was intended only to determine the Fair Market Rental Rate. While the Fair Market Rental Rate may be used to determine the Base Rent, Goldentop contends, the Fair Market Rental Rate does not fully resolve the parties' dispute.

---

[2] Goldentop also claims that certain aspects of Arnett's opinion did not comply with California law regarding signature and service of arbitration awards. (§§ 1283.4, 1283.6.) Goldentop argues that these irregularities show that the broker appraisal process was not an arbitration. We disagree. Whether a dispute resolution procedure is an arbitration is determined by the attributes of the procedure, not by whether the arbitration complied with the procedural requirements of California law. If we were to credit Goldentop's contention, the status of arbitration procedures in California would be thrown into grave doubt because any such procedure could be found *not* to be an arbitration if the arbitrator failed to comply with these formal procedural requirements.

15

Goldentop's argument is not persuasive. Parties may agree to arbitration to resolve the entire controversy between them or some limited portion thereof. (See *Coopers*, *supra*, 212 Cal.App.3d at p. 534.) Goldentop's argument appears to revive the historical distinction between arbitrations and appraisals, where appraisals were not seen as arbitrations because they did not involve a controversy to be resolved. (*Id.* at p. 533.) This distinction was erased by amendments to California's arbitration statutes more than 50 years ago: "[W]e conclude the 1961 statute erased the judicial distinction between agreements to arbitrate disputes and agreements providing for independent examinations by way of valuations, appraisals and similar proceedings, such as audits, and brought such agreements within the arbitration law. As for the requirement that there exist a controversy, it is sufficient the parties *contractually* have agreed to resort to a third party to resolve a particular issue.[3] Because the parties to an arbitration may dispense with a formal hearing and the taking of evidence, the absence of such elements does not impair the status of a proceeding as an arbitration." (*Id.* at p. 534; see *Klubnikin v. California Fair Plan Association* (1978) 84 Cal.App.3d 393, 397.)

For the foregoing reasons, we conclude that the broker appraisal process was an arbitration under California law. The trial court did not err by treating it as such.

---

3    The *Coopers* court included a footnote here quoting the statute's definition of controversy: " 'Controversy' is broadly defined by statute as 'any question arising between parties to an agreement whether such question is one of law or of fact or both.' (§ 1280, subd. (c).)" (*Coopers*, *supra*, 212 Cal.App.3d at p. 534, fn. 5.)

16

II

Goldentop further contends that even if the broker appraisal process is an arbitration, the court erred by confirming Arnett's opinion (joined by Northrop's broker) as an arbitration award. Goldentop contends that confirmation was improper because the award encompassed items not properly included in the Fair Market Rental Rate, such as a tenant improvement allowance, rental abatement, and broker commissions.[4] Goldentop maintains that any confirmed award must be limited to Arnett's opinion of the Fair Market Rental Rate.

"Any party to an arbitration in which an award has been made may petition the court to confirm, correct or vacate the award." (§ 1285.) A petition to confirm an award must be served and filed within four years of service of a signed copy of the award, while a petition to vacate or correct an award must be served and filed within 100 days of such service. (§ 1288.) Any other party to the arbitration may file a response to a petition. "A

---

[4] Goldentop also appears to fault the trial court for confirming an award of Base Rent, rather than simply Arnett's Fair Market Rental Rate opinion. However, as Goldentop acknowledges, Arnett's opinion did not include an award of Base Rent. Arnett first provided a calculation of Base Rent (based on the lease agreement's 95 percent provision) in a declaration in support of Northrop's petition to confirm the award. Although the trial court referenced this calculation in its order granting Northrop's petition, any error in "confirming" an award of Base Rent is harmless. Northrop's declaratory relief causes of action called upon the trial court to interpret the lease agreement and determine whether the Base Rent should be set at 95 percent of the Fair Market Rental Rate. The trial court determined that the lease agreement required such a calculation, even if it resulted in a decrease in the Base Rent, and entered declaratory judgment accordingly. The trial court's judgment would have been no different if the trial court had omitted any reference to Base Rent in its order confirming Arnett's opinion as an arbitration award. In any event, our independent review of the court's ruling granting summary judgment shows that the court was correct to calculate Base Rent as reflecting 95 percent of the Fair Market Rental Rate. (See part III, *post*.)

17

response to a petition under this chapter may request the court to dismiss the petition or to confirm, correct or vacate the award." (§ 1285.2.) However, a party to an arbitration may only file a response seeking to vacate or correct an award within the time period for filing an original petition to vacate or correct an award, i.e., 100 days after service of a signed copy of the award. (§ 1288.2.) If a petition or response is filed, the court must confirm the award or, if sufficient grounds exist, correct or vacate the award. (§ 1286.)[5]

Thus, the court may correct or vacate the award only if a petition or response seeking such relief is filed within 100 days after service of the award; otherwise, the court must confirm the award. " ' "[I]f one wishes to have an award vacated or corrected he must act within one-hundred days of service of the award or be precluded from attacking the award." ' [Citation.] 'If [the party who lost the arbitration does] not serve and file a petition to vacate or a response to [a] petition to confirm within the 100-day period from the date of service of the award . . . , the award must be treated as final.' " (*Eternity Investments Inc. v. Brown* (2007) 151 Cal.App.4th 739, 745; see *Louise Gardens of Encino Homeowners' Association, Inc. v. Truck Insurance Exchange Inc.* (2000) 82 Cal.App.4th 648, 659-660 (*Louise Gardens*).)

"Through this detailed statutory scheme, the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.] Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.)

---

5       The court may also dismiss the proceeding as to any person not a party to the arbitration and not bound by the arbitration award. (§§ 1286, 1287.2.)

" 'The policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.' [Citation.] 'Typically, those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts.' " (*Ibid.*) "Moreover, in reviewing a judgment confirming an arbitration award, we must accept the trial court's findings of fact if substantial evidence supports them, and we must draw every reasonable inference to support the award. [Citation.] On issues concerning whether the arbitrator exceeded his powers, we review the trial court's decision de novo, but we must give substantial deference to the arbitrator's own assessment of his contractual authority." (*Alexander v. Blue Cross of California* (2001) 88 Cal.App.4th 1082, 1087.)

Goldentop did not file a petition to vacate or correct Arnett's award. Nor did it file a response seeking to vacate or correct the award within 100 days of service of the award. Goldentop is therefore barred from raising arguments that, if correct, would require vacating or correcting the award. (See *Louise Gardens*, *supra*, 82 Cal.App.4th at p. 659 ["A party who fails to timely file a petition to vacate under section 1286 may not thereafter attack that award by other means on grounds which would have supported an order to vacate."].)

Goldentop does not dispute this general principle. Instead, Goldentop claims that it is not seeking to correct or vacate the award, but rather, that it is seeking merely to limit confirmation of the award to the only issue properly before Arnett, i.e., the Fair Market

19

Rental Rate, which the lease agreement defines as rent per square foot. In Goldentop's view, Arnett's award—as a factual matter—was limited to the Fair Market Rental Rate. Goldentop argues that the other items are merely considerations that Arnett used to determine the Fair Market Rental Rate, much as an appraiser might describe aspects of other properties in order to assess whether they are comparable or not. Goldentop claims that it had no reason to petition to vacate or correct the award because the award was limited to the Fair Market Rental Rate.

Goldentop's view is not supported by the language of the award. Under the headings "CONCLUSION" and "Fair Market Rental Rate," Arnett's report lists the following items: "Base Rent,"[6] "Term," "Lease rate adjustment," "Tenant Improvements," "Rental abatement," and "Commissions." It is clear that Arnett intended each of these items to be part of his opinion regarding the Fair Market Rental Rate. He did not distinguish the "Base Rent" component (which Goldentop claims is the only effective portion of Arnett's award) from any other component. Goldentop's argument that Arnett's award does not in fact encompass these other components is unpersuasive. Substantial evidence therefore supports the trial court's determination that the award encompasses all of the components identified by Arnett, and we would reach the same conclusion even on de novo review.

---

6     The "Base Rent" in Arnett's opinion was listed as $1.10 per square foot. The parties agree that this "Base Rent" component is not the "Base Rent" defined in the lease agreement. Arnett's Base Rent is merely the rent per square foot component of his Fair Market Rental Rate opinion. The trial court determined that the initial Base Rent per square foot under the lease agreement was $1.045, or 95 percent of Arnett's Base Rent of $1.10.

Goldentop also appears to argue that Arnett was empowered by the lease agreement to award only a per square foot rate as the Fair Market Rental Rate and therefore his award of other components exceeded his authority. The fact that an arbitrator exceeded his authority is a statutory ground for vacating or correcting an arbitration award. (§§ 1286.2, subd. (a)(4), 1286.6, subd. (b).) Goldentop is barred from raising this ground because it did not do so in a timely petition or response. (See *Louise Gardens*, *supra*, 82 Cal.App.4th at p. 659.)

Although unnecessary to our decision, we note that Arnett did not include these components in a vacuum. Goldentop's own appointed broker included a per square foot Fair Market Rental Rate ($1.68) as well as several "Fair Market rental inducements" in his opinion (such as rental abatement, tenant improvements, and annual rent increases), prior to Arnett's appointment. In addition, in the trial court, Goldentop assumed that the per square foot rental rate would increase annually, as Arnett awarded, even though such an increase is not mandated by the language of the renewal terms of lease agreement itself. It is therefore not apparent that Arnett exceeded his powers in proposing Fair Market Rental Rate components in addition to a per square foot rent.

### III

Goldentop contends that the trial court erred by interpreting the lease agreement to allow a decrease in Base Rent based on Arnett's opinion of Fair Market Rental Rate. As we have noted, the lease agreement provides that it may be renewed "on the same terms and conditions set forth in the Lease, except as modified" by the renewal provisions. The renewal provisions mention an "increase[]" in the Base Rent for the renewal term: "[T]he

21

annual Base Rent and monthly installments in effect at the expiration of the then current term of the Lease *shall be increased*, commencing on the first day of the renewal term, *to reflect* ninety-five percent (95%) of the Fair Market Rental Rate (as hereinafter defined)." (Italics added.) If the broker appraisal procedure is invoked, "a majority of the Brokers shall set the Fair Market Rental Rate."[7]

The trial court found that, notwithstanding the use of the word "increased," the lease agreement required that the Base Rent for the renewal term should "reflect" 95 percent of the Fair Market Rental Rate, regardless of whether that calculation resulted in an increase or decrease of the Base Rent. The court relied on its interpretation to grant Northrop's motion for summary judgment on its two declaratory relief causes of action. We review the trial court's summary judgment ruling de novo, using the same standards applicable to the trial court. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.)

The parties dispute the meaning of the renewal provisions in the lease agreement. " 'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party. If it is not, the case is over. [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean? [Citation.] [¶] Whether the

---

7    If a majority of the brokers could not agree, the three broker's opinions would be added together and divided by three. The lease agreement provided that "ninety-five percent (95%) of the resulting quotient shall be the Basic [*sic*] Rent."

contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself [citation] or from extrinsic evidence of the parties' intent [citation].' [Citation.] If a contract is capable of two different reasonable interpretations, the contract is ambiguous." (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448.)

Goldentop contends that the language of the renewal provisions of the lease agreement is clear and unambiguous. Goldentop argues that the phrase "shall be increased" means that the Base Rent could only be increased in the renewal term. In Goldentop's view, if the broker appraisal process resulted in a majority opinion of the Fair Market Rental Rate that would result in a decrease in Base Rent, the Base Rent for the renewal term would nonetheless remain unchanged because the lease would continue on "the same terms" as the prior term under the general prefatory language of the renewal provisions. Northrop, by contrast, contends that the renewal provisions are ambiguous.[8] The phrase "shall be increased" does not account for the situation where the result of the broker appraisal process would yield a Fair Market Rental Rate that, when 95 percent of that figure is calculated, would result in a Base Rent that is lower that the Base Rent in effect at the end of the prior term. In such a situation, the Base Rent cannot be "increased . . . to reflect ninety-five percent (95%) of the Fair Market Rental Rate," as the lease requires.

---

[8]     Northrop makes several additional arguments in favor of affirmance. Given our conclusion, we need not consider these arguments.

23

We conclude that the lease renewal provisions are ambiguous. The views offered by Goldentop and Northrop are both reasonable interpretations of the lease renewal language, given its failure to explicitly account for a decrease in Base Rent in the renewal term.[9] While it is possible that the remainder of the lease (i.e., the prior Base Rent) would apply (as Goldentop argues), it is also possible the parties intended that the Base Rent in the renewal term would always "reflect" 95 percent of the Fair Market Rental Rate as determined by the broker appraisal process regardless of whether that constituted an increase or decrease in Base Rent (as Northrop argues).[10]

We must therefore determine the meaning of the lease renewal provisions, based on the mutual intention of the parties at the time the agreement was executed. (See *Oceanside 84, Ltd. v. Fidelity Federal Bank*, *supra*, 56 Cal.App.4th at p. 1448.) "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the

---

[9]    Contrary to Goldentop's focus, we do not limit our review only to the interpretation of the phrase "shall be increased." Instead, we must determine whether the lease agreement renewal provisions as a whole are ambiguous. (See *Adams v. MHC Colony Park Limited Partnership* (2014) 224 Cal.App.4th 601, 622-623; see also Civ. Code, § 1641.)

[10]    Goldentop relies on the general principle that an omitted term or provision does not render a contract ambiguous. (See, e.g., *Beverly Hills v. Albright* (1960) 184 Cal.App.2d 562, 570.) While correct as a general matter, that principle does not apply where, as here, a term is not omitted. Here, the lease renewal terms are present, but their meaning is ambiguous.

24

contract; and the subsequent conduct of the parties." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.) Where, as here, the interpretation of contractual language does not turn on the credibility of conflicting extrinsic evidence, such interpretation is a legal question that may be resolved on summary judgment. (See *id.* at pp. 912-913; see also *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

The language of the agreement shows that the parties' mutual intent was that the Base Rent in a renewal term would be set by the broker appraisal process (or by mutual agreement), regardless of whether that process resulted in an increase or decrease in Base Rent. The most relevant language is ambiguous: it provides that Base Rent "shall be increased . . . to reflect ninety-five percent (95%) of the Fair Market Rental Rate" set by a majority of the brokers in the broker appraisal process. The words "increase" and "reflect" effectively point to opposite conclusions under the circumstances here, where 95 percent of the Fair Market Rental Rate results in a Base Rent that is less than that in effect at the end of the prior term. However, later in the same paragraph, the renewal provisions state that Base Rent shall be set at 95 percent of the average of the three brokers' opinions if a majority cannot agree on a Fair Market Rental Rate. This provision is silent on the question of an increase or decrease. There does not appear to be any rational reason why a new Base Rent based on a majority opinion of the brokers could only increase, whereas a new Base Rent based on an average of the brokers' opinions could increase or decrease. The language of the agreement therefore points in favor of Northrop's view that the Base Rent may either increase or decrease in the renewal term, depending on the Fair Market Rental Rate.

25

The language of the amendment extending the lease agreement for a first additional five-year term supports Northrop's interpretation. The amendment describes the renewal provisions without limiting their application to *increases* in Base Rent: "Section 3.4 of the Lease [i.e., the renewal provisions] provides Tenant with the option to extend the term of the Lease, with the Base Rent set at ninety-five percent (95%) of the Fair Market Rental Rate as defined therein, and otherwise on the same terms and conditions set forth in the Lease."

Extrinsic evidence of the parties' conduct after the lease agreement was executed also supports this interpretation. "In construing contract terms, the construction given the contract by the acts and conduct of the parties with knowledge of its terms, and before any controversy arises as to its meaning, is relevant on the issue of the parties' intent." (*Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1242.) For example, in a recital in Arnett's consulting agreement, the parties described the Base Rent for the renewal term as follows: "Whereas the rental rate for that renewal period is to be 95% of Fair Market Value [*sic*] . . . ." In both cases, the parties agreed that Base Rent would be 95 percent of the Fair Market Rental Rate (or Value), regardless of whether that reflected an increase or decrease over the prior Base Rent. This extrinsic evidence confirms that the parties' intent was for the Base Rent to be

26

set by the broker appraisal process in the event of a dispute, and that process could result in an increased or decreased Base Rent for the renewal term.[11]

Goldentop argues that the language of the amendment is not binding because it applied only to the first lease extension. In a similar vein, Goldentop argues that neither the amendment nor the language of Arnett's consulting agreement constitutes contractual estoppel under Evidence Code section 622. Even assuming that Goldentop is correct that these documents are not *binding*, they still have evidentiary value in determining the parties' intent. As we have discussed, they show that the parties intended that the Base Rent reflect 95 percent of the Fair Market Rental Rate, regardless of whether the Base Rent was an increase or decrease over the prior Base Rent. Goldentop argues that these documents are irrelevant because, at the time they were created, there had never been a decrease in Base Rent. We disagree. The fact that the amendment, in particular, was created prior to a dispute over the meaning of the lease agreement renewal provisions makes it especially probative of the parties' intent. The parties could have included language in the amendment confirming that the Base Rent could only increase, but they

---

[11]     Goldentop argues that consideration of extrinsic evidence is barred by the parole evidence rule. However, where, as here, a contract is ambiguous, extrinsic evidence may be admissible to interpret the ambiguous provisions of the contract. (*ASP Properties Group, L.P. v. Fard, Inc*. (2005) 133 Cal.App.4th 1257, 1266-1267.) Goldentop's argument is therefore unpersuasive. We note that the trial court admitted additional extrinsic evidence supporting Northrop's interpretation of the lease renewal provisions, including documentation showing the parties' negotiations and a declaration from a Northrop executive, drafted during this litigation, discussing Northrop's intent regarding the lease renewal provisions. Given our conclusion regarding the meaning of the lease renewal provisions based on the language of the lease agreement, the amendment, and Arnett's consulting agreement, we need not consider whether this additional extrinsic evidence would be relevant and admissible to support Northrop's interpretation as well.

did not. Arnett's agreement is also probative because Goldentop agreed to it, even though it does not include language regarding an increase. The absence of such language shows that that the parties intended that Base Rent be set at 95 percent of the Fair Market Rental Rate, regardless of whether the Base Rent in the renewal term was an increase or a decrease over the prior term.

## DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

28